Good morning. Our next case is Valencia v. Board of Regents of the University of New Mexico, number 20-2079. Mr. Moses, you may proceed. Thank you, Judge and panel. I am here before you today to contest the motion for summary judgment, findings of the district court in relation to my client's federal procedural due process, Title VII, and property interest claims. And I want to begin by looking at the procedural due process claims in this case, which have a very interesting and unique procedural history. Now, the district court looked at notice and concluded that notice was given to my client of the charges that were brought against him through submission of letters to my client from the OEO office. Now, at the time these letters were submitted, there were three parallel OEO investigations ongoing involving my client. The first one was filed by an individual in September of 2015. The second one filed in 2015. There was informal notice to my client in June of 2015 from his supervisor of these OEO allegations. He was not given specifics about the allegations. He was only told that two students had gone to the OEO office. And after these two individual OEO claims were submitted, and my client was notified in writing of these claims, and my client was given evidence or told of the evidence that allegedly supported these claims, my client responded to these two individual claims. And the OEO eventually found that with regards to these two individual claims, there was no probable cause to support the claims made against my client. Well, he prevailed on the first claim, didn't he? Excuse me? He prevailed on the first claim, I thought. Yeah. So, the two individual claims, my client prevailed on both. Okay. Let's talk about what you're complaining about. Yeah. What occurs here, Judge Kelly, is that after the September 2015 notice to my client of the two individual claims, a departmental investigation ensued. With regards to that there was never any notice of the claims provided to Professor Valencia at any time. No written notice, no oral notice. These defendants have not provided to the court, either the district court or to the appellate court, any email, letter of confirming that my client was notified that there was a departmental investigation ongoing. And that would include the September 2015. I thought that the OEO did notify your client about complaints at that time, but you're saying that the departmental investigation wasn't mentioned then? Judge Matheson, those notifications only pertain to the individual complaints. Well, they refer to the sexual orientation and gender discrimination claims, didn't they? Yes. And there was no probable cause to find that my client had engaged in that conduct with regards to those two individual claims. Well, while the departmental investigation is ongoing, and I bring all of this up to tell you that I believe that the district court confounded the facts. In other words, it took the facts and the notice from the September 2015 individual claims and confounded it in such a way that the district court concluded that that notice applied to and pertained to the departmental investigation. That is simply misconstruing the facts. And we presented the evidence on our motion for summary judgment to the court showing that these were completely separate matters. So, wait a minute. Didn't your client appeal to the dean, present his position, and then go to the president and presented his position, and then went to the provost and presented his position? And didn't they review the various items and concluded that he didn't present enough? So, what occurs, Judge Kelly, is that because he never participated in the OEO investigation in any form, the OEO investigation, although the district court referred to it as a mere filing of charges, the fact of the matter is the OEO investigation concluded the ultimate issue of sexual harassment and sexual orientation discrimination. The OEO was the ultimate fact finder on the claims that were brought before it. Well, I thought that he had received an invitation and refused to participate in person and sent in an email response. So, there was one occasion, Judge Kelly, where out of the 25 plus claims that were included in the OEO report, my client had an opportunity to respond to two of them. Which two? One was related to a May 2015 incident at a party and afterwards at a bar, and the other one referred to relationships with advisees that my client had. So, and what we have in the record, Judge Kelly, is we have the investigator stating in her testimony that Mr. Valencia had no opportunity to respond to the other 20 plus that were concluded and facts were found on in the OEO report. She testified he never had the opportunity to respond. Well, there's no question but that they did not follow their own procedures. Isn't that correct? No question whatsoever. You're absolutely correct, Judge. But doesn't the follow-up by the dean, the university, and then the provost, doesn't that fill that void? It does not. Let me explain to you why, Judge Kelly. Because the fact findings and conclusions of sexual harassment that were made in the OEO report were written in stone. My client had one opportunity to contest those OEO findings and conclusions. It was before the president. He had no evidence. The OEO never provided any to my client underlying its findings or conclusions. A week after the OEO report issues, Judge Kelly, what happens is my client files the needed appeal to the president. The president that same month concluded that my client didn't satisfy the extraordinary circumstances requirement for overturning the OEO report. From that point on, the OEO report's were unassailable, impregnable. Well, didn't he present documentary evidence of some kind to the parties that he was appealing to in all instances? He certainly did, Judge, but those employees, his supervisors, had no authority under UNM policy. There was no practice at UNM that allowed a supervisor to question or to reinvestigate or to look behind the findings of the OEO. As a matter of fact, after the OEO issued its findings and President Frank decided not that the appeal, my client's appeal, was not valid or meritorious, from that point on, there was no meaningful, meaningful due process that was ever provided by my client. My client could have talked to every supervisor at the University of New Mexico about the OEO findings, but the appeal had already been concluded. The findings had already been written. There was no supervisor on the UNM campus who could go behind those findings. Now, well, Counsel, did the dean or the president have the discretion to send the case back to OEO for further fact-finding? They certainly could have, and as a matter of fact, at one point, Judge Matheson, the interim president, asked a question to the OEO and asked, hey, listen, how in the world did you guys find that these two individual complaints had no probable cause, yet you included them in the allegations of the OEO report as support for its findings? Well, the OEO responded simply by stating, hey, listen, we give to every party the opportunity to present witnesses, present documentation, and that was the end of it. If the OEO had reopened the investigation and given my client an opportunity to respond to the allegations, well, then, and that's the case law in the Tenth Circuit, and I'm thinking about the DeWitt case and the honest belief cases that say, hey, listen, if there's an unfair investigation and the ultimate decision-maker conducts an independent investigation, that's the language in DeWitt, that's the language in the University of Denver case from last year, if they conduct an independent investigation, then the unfair investigation can be cured. Well, there was no independent investigation here. As a matter of fact, the facts of record show that both Hassimi and Abdallah, the ultimate so-called decision-makers, I maintain that the determination decision, the ultimate decision-makers, they had no authority whatsoever, and they admitted that to go behind the OEO investigation. As a fact, they said on the record, we could conduct no further investigation. It was an on-the-record review, an on-the-record appeal. So, in the absence of my client having an opportunity to respond to these very egregious and serious allegations, the OEO report issued on the date that it issued sealed my client's fate. And without any evidence being provided to him, just regular normal due process, things like providing evidence to support the investigation, he asked for it, wouldn't give it to him. He never had it. While he remained as a UNM employee, he never had the investigative file that supported the OEO report, although he requested it on multiple occasions. Moses, when did he refuse to come forward in person and saying he'd only do it by email? Well, what my client desired, Judge Kelly, was to have a record of his interactions with the OEO because he was at that point in an ongoing hostile work environment that he reported to his supervisors, for example, to Passini and to others. And so, he wanted a record. He never refused. There's nothing in the record that shows that the OEO said, hey, listen, we want to talk to you, and my client said no. There's nothing in the record where the OEO sent additional questions outside of those very few questions they sent on those very limited claims. Nothing in the record supports an allegation that, hey, listen, the OEO was trying to get information out of you, and you refused to respond or you refused to provide that information. That is not the case. As a matter of fact, the record shows that when the OEO requested information from my client, within a day, my client provided the information with regards to the individual complaints and with regards to the questions that were posed by the OEO. Now, what do we do about the subsequent actions that I believe have been admitted? I don't believe that's in front of the court at this point with regards to the acquired evidence issues. Is that what you're referring to, Judge? Yes. So, the lower court has not ruled on those issues, has not decided those issues. So, I believe that those issues may be for another day, Judge. All right. Thank you. And the only thing I really want to impress, I see my time is going. There was never an in his favor, never an opportunity during the course of the investigation to present anything in relation to the allegations of the OEO report in the district court. At the end of the day, this is how the district court treated this OEO report. Yeah. So, you should probably conclude. Okay. I'll finish up, Judge. That it was a mere filing of charges. That's the way the district court characterized the OEO report. But at the end of the day, that OEO report was all the nails in the coffin of my client's continued employment. At UNM, I thank you for your time. Thank you, counsel. Ms. Mains. Thank you, Your Honor. And may it please this court. My name is Paula Mains. I represent the Board of Regents of the University of New Mexico and 15 individual defendants named in this appeal. Now, Mr. Moses has described part of this lengthy process, but not all of it. And we take exception to his description. The OEO investigation, as Mr. Moses described, began with two individual complaints. That's what initiated it. In the course of investigating those complaints and within their authority, the Office of Equal Opportunity decided that what they were looking at might be a department-wide pattern of practice discrimination situation. So on their own initiative, they converted this work into a department-wide investigation. And just so that the court appreciates how deep the investigation was, it lasted for nine months. Mr. Moses said we violated our own rules. It's true that we try to conclude these investigations faster than nine months, but this involved changes in semester. Student witnesses were unavailable. Every effort was made to cover every possible location of evidence and involvement of witnesses. Did Mr. Valencia get notice of the pattern and practice in departmental investigation? Yes, he did. And he did participate in it. How did he get notice? He received written notice. I can't remember the date. I know that he received one in September, and he received a second one when the departmental investigation was actually underway. And he was invited, and I want to correct something else, Your Honor. He actually was interviewed. In the context of the departmental investigation. I'm not really sure what motivated his hesitation to be personally interviewed in the two individual investigations, but he provided responses to written questions. So, I mean, there's no way, there was no power for the OEO to compel Mr. Valencia to engage with the OEO in its investigation. This is done on a voluntary basis, but it's certainly the case that once Mr. Valencia was involved with being represented by counsel, his counsel accompanied him to some of these things and participated in the investigation. Was he given the opportunity to bring in his own witnesses and speak with the OEO people? That's sort of two questions, Your Honor. The first one is, was he permitted to bring in his own witnesses? It's done a little differently than that at the OEO level. He was entitled to identify people who he believed the OEO should interview. And in fact, they did. He identified supporting students, students who he believed would counter the allegations and he identified them. They were contacted by OEO and they were interviewed. So, I don't want to leave the impression that it was like an adversarial process. It was an investigatory process. But once the OEO report was issued, number one, Mr. Valencia appealed the process and the substance of the OEO report to the president of the university, Robert Frank. He went to the dean first, didn't he? Well, that's the problem. There's multiple appeals that were going on here, Judge Kelly. And that's why it's a little unclear. It's true that what happened when the OEO report issued, it went to the chair of the department where Mr. Valencia worked for determination whether action was appropriate. That's Les Field, the chair of anthropology. That was to determine first whether there should be any sanction for the conduct reported. He determined there should be censure. And then his determination is a recommendation. It goes up to the dean of arts and sciences. And it's the case that Mr. Valencia pursued appeal to the dean of arts and sciences, to the provost of the university. And he was challenging whether there should be a sanction and what that sanction was. But separately over on a different avenue, he was challenging the process and the substance of the OEO report directly to the president. So, and there was even a third appeal. Well, could the president, excuse me, could the president convene a hearing and hear firsthand or was he limited to the OEO report? He was limited. If you're referring to the appeal related to the OEO report, he was limited to reviewing the report, the evidence that supported the report and the process of the report. So, he was limited in that respect. But let me say there was one appeal that for whatever reason, Mr. Valencia did not pursue. At the end of the sanction process, when the provost ultimately made the decision to terminate Mr. Valencia's remaining seven months in his contract, he could have appealed that decision to the board of regents. There was authority for that. And he had separately appealed his termination decision to the academic freedom and tenure committee. That was a third branch of appeal that was underway at this point. He could have appealed the AF&T decision to the board of regents. Council, can I stop you there? Hello. Can I get you to respond though to opposing council's argument that you can have all the appeals in the world, but once that report was completed, that was it. There was no, that's really what carried the day. And there was really no, this is his argument, no due process leading to that report. Well, I'm not sure, you know, part of what I'm struggling with is due process has sort of two components, pre deprivation and post deprivation. The investigation, I'm not sure exactly what layer of procedural due process we're looking at vis-a-vis the investigation. It is simply a, it's a complaint process and you want to investigate the allegations of the complaint. I understand that Mr. Moses contends that professor Valencia wasn't given a fair opportunity in the investigation. I simply disagree. And so does the district court after reviewing the substantial record before it. It's clear that, you know, he was reluctant to talk to OEO in the context of the individual complaints, but he was not reluctant to participate in the investigation regarding the department-wide investigation. And in fact, just as Mr. Moses brought up in his argument, there was evidence against professor Valencia involving taking students drinking, taking them to his home. Yeah. Allegations that established probable cause in the department, in the OEO of sexual harassment activity. So the OEO report was fully investigated. We reviewed the documents produced from his lawyer and from him. We interviewed witnesses that he asked us to interview who supported him. We interviewed the entire faculty of the anthropology department. So I don't think that, I don't think that due process requires us to hold a hearing or any, anything of that sort at the investigatory phase. Nothing had been resolved in terms of a factual basis at that point. They were still talking to people, finding out their was never a hearing. I agree that there was never what people would describe as an adversarial hearing. In other words, a hearing where witnesses are subpoenaed and cross-examined. And I think that the brief, in our briefs, we argued and we do here that a full-blown adversarial hearing with cross-examination of witnesses is not required in this instance. And there we're looking at the factors that are provided to us by the Matthews versus Eldredge seminal decision in this area. You know, we want, just as a follow-up to Judge Ide's question, and maybe it's a bit of repeat, but is Mr. Moses correct though, that once the OEO report issued, that its findings were, as he put it, written in stone as far as these various other appeals are concerned. I mean, is that it? Well, I'll just have to say it again. That report was the subject of its own appeal. And Mr. Valencia availed himself of that appeal. All of the information in that report, all of the interviews, all of the information rolled up to the president of the University of New Mexico, who sat down and I direct your attention to his decision, which I think appears in the record of the appellant's appendix, Volume 3, 702. He explains that he reviewed the record. He found substantial evidence in that record. So written in stone, I don't think suggests it's subject to an appellate review, which this investigatory report was subject to. And so I just can't agree with that characterization. Do you agree that he was entitled to more substantial pre-termination procedure if his post-termination procedural opportunities were limited? It's a legal question, not factual. I think I do agree with that. What we find in Matthews is that due process is a flexible standard. It takes into consideration the nature of the property interest involved. In this case, not a tenured faculty, wasn't losing retirement benefits. He was losing seven months of a one-year contract as a probationary faculty member. So that's a fact. I thought he was on the road to tenure, no? I'm sorry? I thought he was on the road to tenure. You know, I think that he was not what the university considered tenure track yet. But it's certainly the case that were he to be considered for entry into the tenure track, his past record with the university would have been considered. But he was not tenure track. Okay, thank you. Going back to Judge Matheson's question, and I'm sorry, I just lost the question. Pre-termination, post-termination? Right, exactly. Loudermill tells us that pre-termination process can go into the mix of the total question of whether there is adequate due process for an individual, a government employee, in advance of an adverse action. In this case, certainly there was much more than the minimum standard announced in Loudermill, which is supposed to provide an initial check against mistaken decisions. This went far deeper than that. As I stated, first, Valencia addressed the chair of his department, arguing against any sanction for what was reported in the report. Next, he addressed the dean of students. And again, this is in the record, the dean talked personally to Mr. Valencia and his attorney, heard the arguments you're hearing today. He went back and reviewed the report. He actually interviewed witnesses who were identified in the report and identified to him by Mr. Moses and Mr. Valencia. He then, you know, met face-to-face with him to determine whether or not he was sorry for what had happened or was going to change his behavior. And the dean reports he expressed no remorse. He felt he had done absolutely nothing wrong. Counsel, before you run out of time, could I just ask you one other thing? How do you understand and respond to Mr. Valencia's argument that he learned about new evidence that was used against him only during pretrial discovery? New evidence. I'm not sure I know what you're referring to. I know I gather you're quoting Mr. Moses. Well, this is in the brief. And I think it was a declaration about it. And there was a letter from three students. And he said he only learned about this in the pretrial discovery process. Your Honor, I'm not familiar with that specific piece of the investigation right now. I know that another student came forward and made another complaint. Of course, what the court should remember is that all of these students were named in this federal lawsuit and they were deposed. And there was a full opportunity to cross-examine them. And none of the evidence provided would have assisted Mr. Valencia in his claims. Counsel, your time is expired. Appreciate the argument from both counsel this morning. The case will be submitted and counsel are excused. Thank you. Thank you.